IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Chicago Police Officer ANTHONY HERNANDEZ ) ) | |
|     Plaintiffs    ) ) | |
| v.    ) ) | Case No. |
| The CITY OF CHICAGO, a municipal corporation; ) Chicago Police Sergeant JAMES PADAR; Chicago ) Police Commander JAMES O'GRADY, Chicago    ) Police Commander JOSE RAMIREZ,    ) ) | Judge<br><br>Magistrate Judge |
|     Defendants.    ) _____) | |

## *COMPLAINT AT LAW*

NOW COMES the Plaintiff, ANTHONY HERNANDEZ, by and through his attorney, Patrick J. Walsh, and presents his Complaint at Law and in support thereof, complains as follows:

## *PARTIES TO THE ACTION*

1. Plaintiff City of Chicago Police Officer Anthony Hernandez ("HERNANDEZ") is, and at all times complained of herein was, a duly qualified peace officer employed by defendant CITY OF CHICAGO, an Illinois municipal corporation.

2. Defendant City of Chicago Police Sergeant James Padar ("PADAR") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. SERGEANT PADAR assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. PADAR is sued individually in his capacity as a Chicago Police Officer.

3. Defendant City of Chicago Police Commander James O'Grady ("COMMANDER O'GRADY") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. COMMANDER O'GRADY assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. COMMANDER O'GRADY is sued individually in his capacity as a Chicago Police Officer.

4. Defendant City of Chicago Police Commander Jose Ramirez ("COMMANDER RAMIREZ") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. COMMANDER RAMIREZ assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. COMMANDER RAMIREZ is sued individually in his capacity as a Chicago Police Officer.

5. Defendant CITY OF CHICAGO is, and at all times complained of herein was, a municipality incorporated in the State of Illinois and a municipality within the State of Illinois.

6. This is a civil action for damages to redress deprivations under the color of law of the rights, privileges, and immunities secured under the First and Fourteenth Amendments to the United States Constitution as well as the laws of the State of Illinois.

## *JURISDICTION AND VENUE*

7. This Court has original jurisdiction in this matter pursuant to Federal Question Jurisdiction, 28 U.S.C. § 1331, in that this is a civil action arising under the Constitution, laws or treaties of the United States.

8. This Court has supplemental jurisdiction over plaintiffs' state law claim pursuant to 28 U.S.C. § 1367(a).

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b)(1)(2) and (3), in that the defendants reside and may be found in this district and all of the events occurred in this district.

## *STATEMENT OF FACTS*

10. On February 17, 1998, HERNANDEZ was appointed as a police officer with the CITY OF CHICAGO. Since then, he has had exemplary record and earned numerous awards.

11. Between 2005 and 2011 HERNANDEZ was assigned to the Narcotics Unit and therein acted as an undercover narcotics officer.

12. PADAR was HERNANDEZ'S supervisor and "leader" of the undercover team to which HERNANDEZ was assigned between 2008 and September 2, 2011. COMMANDER RAMIREZ was a lieutenant during those times and was PADAR'S supervisor.

13. In May 2011, PADAR and HERNANDEZ executed a construction contract whereby HERNANDEZ, personally and through subcontractors, would do rehab work on PADAR'S summer home in Sturgis, Michigan ("summer home").

14. Prior to commencing work on the summer home, HERNANDEZ met with PADAR and his wife, Barbara Padar ("Mrs. Padar"), at their home in Chicago. They discussed construction options for the summer home.

15. The contract allowed for variances in the total cost of the work contracted for or if PADAR requested that additional work be done during the period the work was completed.

16. PADAR assured HERNANDEZ that he would keep their contractual relationship separate from their working relationship.

17. On or near April 30, 2011, PADAR, Mrs. Padar, HERNANDEZ, Shannon Spalding, plumber Raymundo Reyes and Veronica Reyes met at the summer home to discuss estimates for the rehab work.

18. On or near May 9, 2011, Mrs. Padar sent HERNANDEZ an email that discussed possible paint colors for the summer home.

19. On or near June 10, 2011, HERNANDEZ called PADAR from the summer home to let him know that additional materials were needed. PADAR agreed to pay for the materials over the phone at Home Depot nearby the summer home.

20. Throughout the construction, the PADARS asked that HERNANDEZ complete work on the home that was not discussed at the time the contract was executed.

21. Prior to September 2, 2011, HERNANDEZ would ask for time off to work on the summer home in equal parts either by submitting a "time due slip" or contacting PADAR through a phone call or text message.

22. It was PADAR'S custom and practice to complete and submit a time due slip for an officer requesting time off if the officer was not on duty or otherwise present when request was granted.

23. HERNANDEZ requested that PADAR grant him the following days off in 2011 so that he could work on the summer home: May 28, June 1, June 2, June 3, June 4, June 8, June 9, June 10, June 25, July 8 and July 9.

24. HERNANDEZ's personal records reflect, and he expected, that time due slips were submitted by PADAR on his behalf for the following days in 2011: May 28, June 1, June 2, June 3, June 4, June 8, June 9, June 10, June 25, July 8 and July 9.

25. However, the individual that authored the daily "Absence & Attendance Sheets" for those dates failed to note HERNANDEZ as absent.

26. Departmental General Orders require that a sergeant complete the daily Absence & Attendance sheet and that multiple supervisors endorse it for verification.

27. On July 11, 2011, PADAR ordered HERNANDEZ to stop working on the summer home apparently because he was out of money. At that point, the work was approximately 90% done.

28. Following the stoppage of work, PADAR notified HERNANDEZ that he would not pay the outstanding balance of approximately $13,000.00.

29. On September 2, 2011, PADAR and HERNANDEZ had a conversation about the outstanding balance due to HERNANDEZ for the rehab work.

30. During the conversation, PADAR told HERNANDEZ "I'm not going to pay you," and HERNANDEZ replied, "I burned a lot of comp time for you."

31. During the conversation, PADAR told HERNANDEZ that he had withheld his time due slips for the days he was working on the summer home without HERNANDEZ'S knowledge or approval.

32. PADAR responded, "No, you didn't burn any time, I held the slips for you…you should consider yourself compensated."

33. HERNANDEZ learned that in fact PADAR withheld HERNANDEZ'S time due slips on each of the dates listed above in Paragraph 23, other than July 9, to make it appear as if HERNANDEZ was actually at work.

34. PADAR then said, "this better never get out, I could get in a lot of trouble for holding back slips…I could get fired. I did this for you, and I've done it for other team members as well."

35. PADAR then said, "If you say anything, it could negatively affect your career."

36. PADAR told HERNANDEZ that he would remove him from the narcotics team if he persisted in attempting to enforce their contract and collect the outstanding balance due per the contract.

37. HERNANDEZ replied that he intended to collect the money owed him and needed to "consider his options" in reference to filing a lawsuit for breach of contract.

38. On September 2, 2011, HERNANDEZ called COMMANDER RAMIREZ and reported that PADAR wanted him off the narcotics team solely because he owed HERNANDEZ money. COMMANDER RAMIREZ responded that he had already spoken with PADAR and that PADAR was "no longer comfortable" with HERNANDEZ on his narcotics team.

39. HERNANDEZ attempted to explain the conflict further and that PADAR had withheld time slips, but COMMANDER RAMIREZ said "I don't want to get involved in your personal business" and hung up the phone.

40. On September 3, 2011, COMMANDER RAMIREZ informed HERNANDEZ that he had been removed from PADAR'S narcotics team and assigned to Sergeant Rick Herrera's team.

41. COMMANDER RAMIREZ not only carried out PADAR'S request to move HERNANDEZ, but he refused to discipline PADAR or otherwise investigate HERNANDEZ'S claims about PADAR.

42. HERNANDEZ'S new assignment with Sergeant Herrera's team was on a "buy bust team," rather than as an "undercover officer," as he was on PADAR'S team. Being an "undercover officer" is a more desirable assignment than being on a "buy bust team."

43. There was significantly less overtime pay available to HERNANDEZ on the buy bust team than there was as an undercover officer on the conspiracy team.

44. On or near September 6, 2011, HERNANDEZ filed a complaint with the Chicago Police Department's Internal Affairs Division against PADAR for abuse of authority and retaliation.

45. The complaint of September 6, 2011 included details of PADAR's practice of withholding time due slips for HERNANDEZ and other officers.

46. In December 2011, HERNANDEZ was removed from Sergeant Herrera's narcotics team and placed on Sergeant Blanks' narcotics team.

47. In May 2012, HERNANDEZ was assigned to work the midnight shift in the guard shack of Chicago Police Department's Homan Square facility during the NATO Conference. He was the only officer in the Narcotics Division made to work midnights and the only officer in the entire Organized Crime Division assigned to work the entire NATO Conference in the guard shack.

48. On June 1, 2012, HERNANDEZ was restored to a full-duty position and detailed back to Sergeant Blank's narcotics team only after a grievance was resolved in his favor.

49. Week later, Chicago Police Sergeant Tony DeChristofano told HERNANDEZ that he was being assigned to the guard shack permanently and that the order came directly from COMMANDER O'GRADY.

50. On June 21, 2012, HERNANDEZ was reassigned to the afternoon shift in the guard shacks at Homan Square.

51. The Spaulding guard shack is more commonly known as the "punishment box" to Chicago Police Officers familiar with Homan Square. His department-issued take-home car and Nextel phone were also revoked by the department.

52. Guard shacks are normally staffed only with officers on "limited duty." The Spaulding guard shack in particular is one that is not normally manned by any officer.

53. Following his assignment to the guard shacks, HERNANDEZ was stripped of any opportunity to earn overtime wages.

54. O'GRADY told HERNANDEZ that he was being put in the guard shack because he didn't have confidence that his personnel would back HERNANDEZ up on the street because he had filed a complaint against PADAR.

55. HERNANDEZ suffered severe health issues, including a heart attack, as the result of stress he incurred due to the retaliation of PADAR and O'GRADY.

56. HERNANDEZ used up much of his vacation and compensatory time while working on the summer home.

## *COUNT I – VIOLATION OF FIRST AMENDMENT VIA 42 U.S.C § 1983*

57. That HERNANDEZ repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one through fifty-six as if fully set forth herein.

58. That the First Amendment to the United States Constitution guarantees HERNANDEZ'S right to speak out on matters of public concern without fear of unjust retaliation.

59. That HERNANDEZ engaged in extensive protected speech on matters of public concern by implicating PADAR in violations of federal law with regard to his duties as Chicago Police Officer.

60. That in direct retaliation for their exercise of protected speech, Defendants retaliated against HERNANDEZ in the manner described in the preceding paragraphs.

61. That the retaliation and misconduct described in this Count was devised and carried out individuals with final policymaking authority to establish municipal policy with respect to the actions ordered or delegated.

62. That the retaliation and misconduct described in this Count constituted the municipal policy and widespread practice of the City of Chicago to retaliate against officers that investigate or complain of misconduct by fellow officers regardless of the truth of the complaints.

63. That as a result of the aforementioned deprivation of federal rights, HERNANDEZ suffered, and will likely continue to suffer, grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, Plaintiff demands reassignment and compensation from all defendants in an amount in excess of $200,000 in compensatory damages, attorney's fees, costs of suit, and exemplary damages as warranted.

### *COUNT II – VIOLATION OF EQUAL PROTECTION VIA 42 U.S.C. § 1983*

64. That HERNANDEZ repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one through fifty-six as if fully set forth herein.

9

65. That HERNANDEZ was retaliated against based upon his membership in a certain class of individuals, i.e., whistleblowers who complained about and investigated fellow Chicago Police Officers.

66. Members of HERNANDEZ'S class were treated differently than other similarly-situated individuals that were not whistleblowers or did not complain or investigate fellow Chicago Police Officers.

67. That the differential treatment of HERNANDEZ, described in the preceding paragraphs, was intentional and arbitrary, motivated by nefarious and discriminatory purpose, and not rationally related to any governmental interest.

68. That the misconduct described in this Count was undertaken by municipal policymakers with final authority to establish municipal policy with respect to the actions ordered or delegated.

69. That the misconduct described in this Count constituted the municipal policy and widespread practice of the CITY OF CHICAGO.

70. That the Defendants each acted under color of law in depriving HERNANDEZ of his Fourteenth Amendment right to Equal Protection as secured by the Constitution of the United States.

71. That as a result of the aforementioned deprivation of federal rights, HERNANDEZ suffered, and will likely continue to suffer, grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, Plaintiff demands reassignment and compensation from all defendants in an amount in excess of $200,000 in compensatory damages, attorney's fees, costs of suit, and exemplary damages as warranted.

### *COUNT III – VIOLATION OF DUE PROCESS VIA 42 U.S.C. § 1983*

72. That HERNANDEZ repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one through fifty-six as if fully set forth herein.

73. That HERNANDEZ had a reasonable expectation of due process of law in the utilization of the disciplinary procedures of the Chicago Police Department.

74. That Defendants demoted HERNANDEZ and divested him of all meaningful responsibilities with regard to his employment as a Chicago Police Officer.

75. That HERNANDEZ was deprived of his Fourteenth Amendment right to due process as secured by the Constitution of the United States.

76. That the Defendants jointly and in conspiracy were responsible for the deprivation of HERNANDEZ'S Federal Rights.

77. That Defendants jointly and in conspiracy were acting under the color of law when depriving HERNANDEZ of these rights.

78. That as a result of the aforementioned deprivation of federal rights, HERNANDEZ suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe physical and emotional distress.

79. That the Defendants each acted under color of law in depriving HERNANDEZ of his Fourteenth Amendment right to Equal Protection as secured by the Constitution of the United States.

80. That as a result of the aforementioned deprivation of federal rights, HERNANDEZ suffered, and will likely continue to suffer, grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, Plaintiff demands reassignment and compensation from all defendants in an amount in excess of $200,000 in compensatory damages, attorney's fees, costs of suit, and exemplary damages as warranted.

### *COUNT IV – CONSPIRACY VIA 42 U.S.C. § 1983*

81. That HERNANDEZ repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one through fifty-six as if fully set forth herein.

82. That as described in the preceding paragraphs, Defendants, acting in concert with other known and unknown conspirators, reached an understanding to deprive HERNANDEZ of his Constitutional rights.

83. That HERNANDEZ was deprived of his Constitutional rights in the manner described in the preceding paragraphs.

84. That in furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity with state actors under color of law.

85. That the misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

86. That as a result of the aforementioned deprivation of federal rights, HERNANDEZ suffered, and will likely continue to suffer, grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, Plaintiff demands reassignment and compensation from all defendants in an amount in excess of $200,000 in compensatory damages, attorney's fees, costs of suit, and exemplary damages as warranted.

### *COUNT V – MONELL CLAIM – CODE OF SILENCE*

87. That HERNANDEZ repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one through fifty-six as if fully set forth herein.

88. That the retaliation against HERNANDEZ was part of a custom, policy and practice espoused by the CITY OF CHICAGO and its policymakers in the Police Department to enforce a "Code of Silence" and thereby punish officers that investigated or complained of misconduct by other officers.

89. That as a result of employing a custom, policy and practice espoused by the CITY OF CHICAGO to retaliate against those officers that complained about or investigated fellow officers accused of misconduct or criminal acts, HERNANDEZ suffered, and will likely continue to suffer, grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, Plaintiff demands reassignment and compensation from all defendants in an amount in excess of $200,000 in compensatory damages, attorney's fees, costs of suit, and exemplary damages as warranted.

### *COUNT VI – VIOLATION OF THE ILLINOIS WHISTLEBLOWER PROTECTION ACT AGAINST CITY OF CHICAGO*

90. That HERNANDEZ repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one through fifty-six as if fully set forth herein.

91. That the CITY OF CHICAGO was at all times complained of HERNANDEZ'S employer as defined in 740 ILCS § 174/5.

92. That HERNANDEZ was at all times complained of employees of the CITY OF CHICAGO as defined in 740 ILCS § 174/5.

93. That the CITY OF CHICAGO and its employees and agents were prohibited according to 740 ILCS § 174/15 from retaliating against HERNANDEZ for disclosing to the Internal Affairs Division what he reasonably believed and in fact knew were multiple violations of federal law by PADAR.

94. That the CITY OF CHICAGO retaliated against HERNANDEZ by demoting him, taking away all of his responsibilities, denying him overtime, taking away his take-home car and phone, and assigning him to the guard shack, which is usually reserved for officers on "limited duty status."

95. That as a result of the aforesaid retaliation, HERNANDEZ suffered loss of wages, loss of future wages, loss of opportunity, and severe physical and emotional distress that required him to seek the care of medical professionals.

WHEREFORE, Plaintiff demands compensation from all defendants in an amount in excess of $200,000 in compensatory damages, attorney's fees, costs of suit, and exemplary damages as warranted.

## *COUNT VII - BREACH OF CONTRACT*

96. That HERNANDEZ repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one through fifty-six as if fully set forth herein.

97. That on May 2, 2011, HERNANDEZ entered into a contract with PADAR, the owner of the summer home located in Sturgis Michigan. See Exhibit A.

98. That on or near September 2, 2011, PADAR wrongfully terminated the contract.

99. That accordingly, PADAR breached the contract by failing to pay HERNANDEZ the amount remaining due thereunder in the amount of $13,000.00. PADAR'S breach of the contract has caused HERNANDEZ to be damaged in the amount of $13,000.00.

100. That although often requested to pay said balance due, PADAR has failed and refused to do so.

WHEREFORE, Plaintiff demands this Court enter judgment in his favor in Count VI in the amount of $13,000.00 plus costs.

### *COUNT VIII – QUANTUM MERUIT*

101. That HERNANDEZ repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one through fifty-six as if fully set forth herein.

102. That pursuant to the contract, HERNANDEZ provided his labor, at the direction, authorization and permission of PADAR.

103. That allowing PADAR to retain the benefits provided by HERNANDEZ without compensation to HERNANDEZ, would unjustly enrich PADAR in the amount of $13,000.00.

104. That the labor supplied by HERNANDEZ was provided with the expectation of payment. The benefit given by HERNANDEZ to PADAR exceeded the payments received by HERNANDEZ in the sum of no less than $13,000.00. In the event HERNANDEZ'S contract is not proved, and pleading in the alternative, it would be unjust to allow PADAR to retain the benefit given without paying the same.

105. HERNANDEZ has suffered a detriment in the amount of $13,000.00 for providing labor and therefore seeks recovery of damages in the amount stated above.

WHEREFORE, Plaintiff demands this Court enter judgment in his favor in Count VII in the amount of $13,000.00 plus costs.

## *COUNT IX – PREJUDGMENT INTEREST*

106. That HERNANDEZ repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one through fifty-six as if fully set forth herein.

107. That the Illinois Interest Act, 815 ILCS § 205/2 provides:

> Creditors shall be allowed to receive at the rate of five percent (5%) per annum all monies after they become due on any bond, bill, promissory note, or other instrument of writing – and on money withheld on an unreasonable vexatious delay of payment. pursuant to the contract, HERNANDEZ provided his labor, at the direction, authorization.

108. That Plaintiff is entitled to an award of prejudgment interest from September 2, 2011 to January 9, 2013 in the amount of $229.73 plus the additional interest at the rate of $1.78 per day.

WHEREFORE, Plaintiff respectfully demands this Honorable Court enter judgment of prejudgment interest from September 2, 2011 to January 9, 2013 in the amount of $229.73 plus the additional interest at the rate of $1.78 per day in his favor on Count VIII.

## *RULE 38 JURY DEMAND*

Plaintiff demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

        Respectfully submitted,

        ELLIOT R. ZINGER & ASSOCIATES

        By: \_\_\_/s/ Patrick J. Walsh_____
            Patrick J. Walsh, Esq.
            One of Plaintiffs' Attorneys

16

Patrick J. Walsh, Esq.
ELLIOT R. ZINGER & ASSOCIATES
10 South LaSalle Street, Suite 1420
Chicago, Illinois 60603
(312) 782-9464
ARDC No. 6287629